**KHODARA ENVIRONMENTAL, INC., general partner, on Behalf of Eagle Environmental, L.P., Plaintiffs,**

**v.**

**Kelly BURCH,[1] Jane F. Garvey, Federal Aviation Administration, Defendants.**

**Leatherwood, Inc., Plaintiff,**

**v.**

**Pennsylvania Department of Environmental Protection, et al., Defendants.**

No. CIV.A. 97–93.

United States District Court, W.D. Pennsylvania.

Oct. 1, 2002.

---

**1.** This lawsuit originally named Steven Beckman as a Defendant in his official capacity as Regional Director of the Pennsylvania Department of Environmental Protection. Mr. Beckman is no longer serving in that position, however, and we will therefore substitute Kelly Burch, the current Regional Director, as the relevant party in interest. *See* Fed. R.Civ.P. 25(d)(1).

John P. Krill, David R. Overstreet, Carleston O. Strouss, Kirkpatrick & Lockhart, Harrisburg, PA, William F. Fox, Jr., Albert F. Fox, Jr., Albert A. DeGennaro, J.P. Mascaro & Sons, Harleysville, PA, James V. Corbelli, Joseph K. Reinhart, Timothy C. Wolfson, Babst, Calland, Clements & Zomnir, Pittsburgh, PA, for Plaintiffs.

Thaddeus A. Weber, Meadville, PA, Michael D. Buchwach, Pittsburgh, PA, Marsha S. Edney, Sandra M. Schraibman, Department of Justice Civil Division, Isaac R. Campbell, Department of Justice Civil Division, Federal Programs Branch, Washington, DC, Thomas L. Wenger, Steven R. Williams, Wix, Wenger & Weidner, Harrisburg, PA, Robert P. Ging, Jr., Confluence, PA, for Defendants.

## MEMORANDUM OPINION

MCLAUGHLIN, District Judge.

Presently pending before the Court in these consolidated cases are various cross-motions for summary judgment. For the reasons that follow, the motions filed by the Commonwealth and Federal Defendants will be granted. The motions filed by the Plaintiffs will be denied. The motion filed on behalf of the Intervenors Jefferson County and Pinecreek Township will likewise be denied.

## I. PROCEDURAL HISTORY

*Eagle Environmental, L.P., and the Happy Landing Landfill*

Plaintiff Khodara Environmental, Inc., general partner acting on behalf of Eagle Environmental, L.P. (collectively referred to as "Eagle") owns and/or has an interest in several hundreds of acres of land in Washington Township, Jefferson County, Pennsylvania. It has been Eagle's intention for many years to develop a solid waste disposal facility on the property, known as the "Happy Landing Landfill," which would be located approximately 5.25 miles from the Dubois–Jefferson County Airport and which would accept municipal waste from various locales having a scarcity of landfill space.

In or around 1990, Eagle began to apply for a series of permits from the Pennsylvania Department of Environmental Protection ("DEP"). On February 9, 1996, the DEP issued certain permits necessary for construction and operation of the landfill, *to wit:* a Water Obstruction and Encroachment Permit allowing for the filling of certain wetlands, a National Pollutant Discharge Elimination System (NPDES) Permit, a Solid Waste Permit, and an Air Quality Permit. Upon becoming initially permitted, Eagle undertook certain steps relative to the development of the landfill, including obtaining various engineering studies and installing twelve groundwater monitoring wells in June of 1996.

In September 1996, the Pennsylvania Fish and Boat Commission designated three tributaries near the landfill site as wild trout streams. Based on these designations, the DEP determined that certain wetlands in and around the landfill area were of "exceptional value" and should not be filled. Consequently, the DEP concluded that Eagle's plan to develop and operate the landfill should not have been permitted as proposed in that the plan had included inaccurate information about the streams.

On September 25, 1996, Defendant Steven Beckman, then Regional Director of the DEP, issued an administrative order modifying the Water Obstruction and Encroachment Permit by revoking authorization to fill in any wetlands. The order also suspended the Solid Waste Permit, the Air Quality Permit, the NPDES Permit, and the unmodified portion of the Encroachment Permit. This suspension order became the subject of an appeal before the Environmental Hearing Board styled *Eagle Environmental L.P. v. Commonwealth of Pennsylvania Department of Environmental Protection*, EHB Docket No. 96–215–MG.

On February 7, 1997, Eagle entered into a Consent Order and Agreement ("CO & A") with the DEP which permitted the release of bonds that Eagle had submitted in the process of obtaining its Solid Waste Permit. Under the CO & A, Eagle agreed that it "shall not construct or operate the Happy Landing Landfill until and unless the [Solid Waste] Permit is reinstated and the bonding requirements of the [Pennsylvania Solid Waste Management Act] are met." All of the permits issued by the DEP to Eagle relative to the Happy Landing Landfill remained suspended pending Eagle's pursuit of administrative relief in the state courts.

On September 3, 1998, the Environmental Hearing Board issued an administrative order affirming the DEP's suspension order. The Pennsylvania Commonwealth Court likewise affirmed and, on June 12, 2002, the DEP's September 25, 1996 suspension order became final when the Pennsylvania Supreme Court denied further review.

In the meantime, on October 9, 1996, Congress enacted the Federal Aviation Reauthorization Act of 1996, Pub.L. No. 104–264 ("FARA"), formerly codified at 49 U.S.C. § 44718(d). Section 1220 of FARA provided, in relevant part:

For the purpose of enhancing aviation safety, in a case in which 2 landfills have been proposed to be constructed or established within 6 miles of a commercial service airport with fewer than 50,000 enplanements per year, no person shall construct or establish either landfill if an official of the Federal Aviation Administration has stated in writing within the 3–year period ending on the date of enactment of this subsection that 1 of the landfills would be incompatible with aircraft operations at the airport, unless the landfill is already active on such date of enactment or the airport operator agrees to the construction or establishment of the landfill.

Eagle originally commenced this action seeking, primarily, a declaration that Section 1220 was unconstitutional and/or that it did not apply to the Happy Landing Landfill. On March 31, 1999, this Court granted partial summary judgment in favor of Eagle by ruling that the statute violated Eagle's equal protection rights. *See Khodara Environmental, Inc. v. Beckman* (hereinafter, *Khodara I*), 91 F.Supp.2d 827, 850–57 (W.D.Pa.1999), *aff'd in part, vacated in part and remanded*, 237 F.3d 186 (3d Cir.2001). Cross-appeals were taken by various parties to the Unit-

ed States Court of Appeals for the Third Circuit.

While this Court's March 31, 1999 ruling was on appeal, Congress enacted the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21"), which repealed the 1996 Act and added new statutory language codified at 49 U.S.C. § 44718(d). Section 503(d) of AIR–21, which was signed into law on April 5, 2000, provides, in relevant part:

> (1) In general.—No person shall construct or establish a municipal waste solid waste landfill ... that receives putrescible waste ... within 6 miles of a public airport that ... is primarily served by general aviation aircraft and regularly scheduled flights of aircraft designed for 60 passengers or less unless the State aviation agency of the State in which the airport is located requests that the Administrator of the [FAA] exempt the landfill from the application of this subsection and the Administrator determines that such exemption would have no adverse impact on aviation safety.
>
> (2) Limitation on applicability.—Paragraph (1) shall not apply in the State of Alaska and shall not apply to construction, establishment, expansion, or modification of, or to any other activity undertaken with respect to, a municipal solid waste landfill if the construction or establishment of the landfill was commenced on or before the date of the enactment of this subsection.

49 U.S.C. § 44718(d).

In light of the critical amendment to § 44718(d) effected by AIR–21, the Third Circuit vacated that portion of this Court's March 31, 1999 opinion which had ruled that the 1996 Act was facially unconstitutional. *See Khodara Environmental, Inc. v. Beckman,* 237 F.3d 186 (3d Cir.2001). The case was remanded in order for Eagle to file an amended complaint addressing any claims it might have relative to AIR–21.

On April 6, 2001, Eagle filed an Amended Complaint seeking relief under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 *et seq.* as against Steven Beckman, the FAA, and its Administrator, Jane Garvey.[2] Count I of the Amended Complaint seeks a declaration that AIR–21 does not apply to the Happy Landing Landfill under the theory that "construction" and "establishment" of the landfill was "commenced" prior to the enactment date of April 5, 2000. Count II seeks an alternative declaration that Eagle is exempted from the statute's prohibition pursuant to 49 U.S.C. § 44718(d)(1) in that operation of the Landfill will not have an adverse impact on aviation safety. Counts III through VI of the Amended Complaint seek declarations that AIR–21 is unconstitutional in various respects, *to wit:* the statute constitutes an unlawful delegation of legislative power to state aviation authorities, compels state agencies to participate in the administration of a federal regulatory program, impairs Eagle's First Amendment right to petition the government for redress, and deprives Eagle of its equal protection and due process rights. As to all counts, Eagle seeks injunctive relief permanently enjoining Defendants Beckman and Garvey from applying AIR–21's prohibitions to the Happy Landing Landfill.

The parties are once again before the Court having filed various cross-motions for summary judgment relative to Count I

---

**2.** Intervenors Jefferson County and Pinecreek Township ("the Intervenors") also remain parties to this dispute.

of Eagle's Amended Complaint. In essence, we are asked to determine whether AIR–21 facially applies to the Happy Landing Landfill, which in turn requires this Court to interpret critical language in § 44718(d)(2). In addition, certain of the parties have raised threshold jurisdictional challenges to Eagle's claims which we must address. Finally, the FAA and its Administrator Jane Garvey (the "Federal Defendants") also seek summary judgment as to Eagle's remaining claims in Counts II through VI of the Amended Complaint. These matters have been briefed and argued and are now ripe for disposition.

*Leatherwood, Inc. and The Jefferson Landfill*

Plaintiff Leatherwood, Inc. is a Pennsylvania corporation with an interest in over 750 acres of land in Pinecreek Township, Jefferson County, Pennsylvania on which it intends to develop a landfill known as the Jefferson Landfill. In the early 1990's, Leatherwood developed information and began to submit application materials to the DEP for certain permits necessary to build and operate the landfill. In 1994 Leatherwood submitted to the DEP its application, in final form, for a permit under the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.101 *et seq.* ("Solid Waste Permit"). On May 12, 1995 the DEP issued the Solid Waste Permit, along with several other ancillary permits, including:

 * a Water Quality NPDES Permit, authorizing a discharge from the Jefferson Landfill's wastewater treatment facility;

 * a Soil and Waterway NPDES Permit authorizing discharge of storm water from certain construction activities described in Leatherwood's Erosion and Sedimentation Control Plan and the Solid Waste Permit Application;

 * a Joint Permit Application, Water Obstruction and Encroachment Permit.

Various administrative appeals were initiated thereafter by interested parties who challenged the DEP's order granting Leatherwood's Solid Waste Permit.[3]

Leatherwood meanwhile, with its Solid Waste Permit still in place, undertook additional measures toward the development of its landfill. It began the process of installing several ground water monitoring wells which, under ¶ 24 of the Solid Waste Permit, is designated a "[m]ajor construction activity." (Leatherwood's Ex. 1, ¶ 24.) The wells were ultimately completed in July of 1995. Leatherwood also engaged a consultant and began preparing its application to construct and operate a gas flaring system as required by ¶ 7 of the Solid Waste Permit and the provisions of the Pennsylvania Air Pollution Control Act. (*Id.* at ¶ 7.) Leatherwood similarly engaged a consultant to conduct a bird study, which was necessary in order to complete a bird hazard mitigation plan pursuant to ¶ 40 of the Solid Waste Permit. (*Id.* at ¶ 40.)

Progress on the Jefferson Landfill was interrupted by the passage of Section 1220 of FARA, which made "construction" or "establishment" of the Jefferson Landfill unlawful. Based upon the enactment of Section 1220, the DEP issued an Order on October 21, 1996 suspending Leatherwood's Solid Waste Permit. (Intervenors'

---

**3.** On June 8, 1995 the Commissioners of Jefferson County, the Jefferson County Solid Waste Authority, and the Clearfield–Jefferson Counties Regional Airport Authority filed a third-party appeal of the Solid Waste Permit, docketed at EHB Docket No. 95–097–C. A separate appeal of the Permit was commenced by Pinecreek Township on June 12, 1995 at EHB Docket No. 95–102. The two cases were consolidated at the former docket number.

Ex. to the Resp. of Leatherwood's Statement of Material Facts, Exhibit 8.) Thereafter, on January 9, 1997, Leatherwood entered into a consent order and agreement with the DEP by which Leatherwood received back its bonds and agreed not to "construct or operate" the landfill unless and until its Solid Waste Permit was reinstated. (Intervenors' Ex. to the Resp. of Leatherwood's Statement of Material Facts, Exhibit 7, Finding 4.)

In the wake of this Court's March 31, 1999 ruling in *Khodara I*, Leatherwood wrote to the DEP and requested that the suspension of its permits be lifted. The DEP declined to lift the suspension and ordered Leatherwood to submit an air quality permit application for the gas flaring system prior to reinstatement of its Solid Waste Permit. Leatherwood claims that the DEP also made new demands concerning the timing of its submission of a bird mitigation plan.

On March 17, 2000, Leatherwood filed a "Petition for Supersedeas of 1996 Suspension Order." In response, the DEP issued an order on March 20, 2000 revoking its 1996 Suspension Order and simultaneously suspending the Solid Waste Permit for a second time.

On April 5, 2000, Section 503 of AIR–21 was enacted into law. By that date, Leatherwood had submitted a bird hazard mitigation plan and an air quality plan to the DEP and had also filed renewals and extensions of ancillary federal and state permits. Leatherwood's most current amendments to its bird hazard mitigation plan were submitted to the DEP in August of 2000.

On August 26, 2000, the FAA issued Advisory Circular 150/5200–34 (the "Advisory Circular"), which purported to give clarity to AIR–21's applicability and meaning. Following the issuance of its Advisory Circular, the FAA received a letter from the DEP seeking the FAA's opinion as to whether the new statute would apply to the Jefferson Landfill. Prior to receiving any formal response from the FAA, the DEP on January 5, 2001 sent a decision letter to Leatherwood in which it took the position that the Jefferson Landfill is subject to Section 503's prohibitions and does not fall within the exception created by subsection (d)(2). In so concluding, the DEP relied largely upon the Advisory Circular as well as correspondence from various other parties. Based on its interpretation of Section 503, the DEP declined to take any further action regarding approval or disapproval of Leatherwood's bird hazard mitigation plan.

By letter dated January 29, 2001, the FAA notified the DEP that it too considered the Jefferson Landfill subject to the prohibitions of AIR–21. The FAA further advised that, in its view, "construction of a landfill begins when the proponent first 'turns dirt' to prepare the first cell to receive municipal solid waste" and that "soil sampling, conducting percolation tests, or installing groundwater monitoring wells do not constitute 'turning dirt' to prepare the first cell." (*See* Ex. 14, Append. to Leatherwood's Response to the [FAA]'s Mot. for Summ. Judg.)

Leatherwood's Solid Waste Permit was ultimately revoked pursuant to an order entered by the Pennsylvania Environmental Hearing Board on February 28, 2002 at EHB Docket No. 95–097–C.[4] In addition

4. The EHB concluded, in relevant part, that:
 1. DEP committed errors if law and otherwise acted unreasonably when applying 25 Pa.Code §§ 271.127(a), (b) and (c) (1995) with respect to the harm to public safety posed [by] the Landfill in the form of a bird hazard.

to this set back, Leatherwood has never received a local building permit, an airport zoning permit, a permit demonstrating compliance with the Pennsylvania Sewage Facilities Act, or an air quality permit, all of which are necessary prerequisites to the successful development and operation of the Jefferson Landfill.

On January 17, 2001, Leatherwood commenced an action against the DEP, Steven Beckman, Jefferson County and Pinecreek Township seeking a declaratory judgment relative to the meaning and applicability of Section 503 of AIR–21. By Order dated March 7, 2001, Leatherwood's case was consolidated with this case. On April 6, 2001, Leatherwood filed is First Amended Complaint, adding the FAA and Jane F. Garvey as Defendants. Leatherwood's Amended Complaint contains only a single count seeking a declaration from this Court that Leatherwood "commenced construction or establishment" of the Jefferson Landfill prior to the enactment of Section 503 of AIR–21 and is therefore excepted from its general prohibition. Discovery has been completed and the parties have filed cross-motions for summary judgment which are now ripe for disposition.

## II. STANDARD OF REVIEW

In evaluating the parties' various cross-motions for summary judgment, we must determine whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also Deane v. Pocono Med.*

*Ctr.,* 142 F.3d 138, 142 n. 3 (3d Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Olson v. General Electric Astrospace,* 101 F.3d 947, 951 (3d Cir.1996)).

## III. STANDING/ RIPENESS

 Initially, we must address the argument raised by certain Defendants that the Plaintiffs lack standing to pursue these actions. In order to establish standing, a plaintiff must demonstrate (i) an "injury in fact," (ii) a causal connection between the injury and the conduct complained of, and (iii) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision. *See Pitt News v. Fisher,* 215 F.3d 354, 359 (3d Cir.2000) (citation omitted); *Artway v. Attorney General of State of New Jersey,* 81 F.3d 1235, 1246 (3d Cir.1996). In the context of a declaratory judgment action, standing is satisfied when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *The St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Government of the United States Virgin Islands,* 218 F.3d 232, 240 (3d Cir.2000) (quoting *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 647 (3d Cir. 1990)).

 A related concept, ripeness, addresses the timing of when an action can be litigated. In determining whether a

2. The evidence presented to the Board demonstrated that the Landfill will cause a significant bird hazard, and that Leatherwood has not yet shown that this serious threat to public safety can be successfully mitigated to a acceptable level of risk, contrary to the mandate of the SWMA and 25 Pa.Code §§ 271.127(a), (b) and (c) (1995). (*See* Intervenor's Exhibits to the Resp. to Leatherwood's Statement of Material Facts [Doc. No. 212], Exhibit 1 at pp. 99–100.)

controversy is "ripe" for review, courts consider whether the issues are fit for judicial resolution and whether withholding judicial resolution will result in hardship to the parties. *See Khodara I,* 91 F.Supp.2d at 836–837 (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *New Hanover Twp. v. United States Army Corps of Engineers,* 992 F.2d 470, 472 (3d Cir.1993)), *vacated in part on other grounds, aff'd in part and remanded,* 237 F.3d 186 (3d Cir.2001). In the context of declaratory actions, courts consider (a) whether the requisite adversity of interests exists, (b) the potential conclusiveness of a judgment, and (c) whether a judgment would have any practical utility. *See Pic-A–State Pa., Inc. v. Reno,* 76 F.3d 1294, 1298 (3d Cir.), *cert. denied,* 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).

**A. Eagle Environmental**

Insofar as Eagle's case is concerned, it should be noted that this Court previously addressed challenges to standing and ripeness on two separate occasions. The Court originally considered, but rejected, such challenges in connection with Defendant Beckman's motion to dismiss in Khodara I. Later, those claims were revisited by this Court when Beckman raised them once again in his motion for summary judgment. Beckman sought summary judgment in *Khodara I* on the grounds that Eagle had allegedly suffered no "injury in fact"—i.e., the FAA Amendment under review had never been formally enforced as to Eagle and, in fact, Eagle's development of the landfill had been forestalled due to state permitting issues unrelated to the FAA Amendment. It was undisputed in *Khodara I* that, as a matter of Pennsylvania law, Eagle could not further develop the Landfill unless and until its Solid Waste Permit were reinstated and its bonding requirements satisfied pursuant to the Pennsylvania Solid Waste Management Act. Eagle had been engaged in extensive litigation relative to various permitting issues which it estimated would cost approximately $200,000 or more to pursue. Significantly, Eagle had expressed its intent to complete the Happy Landing Landfill regardless of the outcome of the federal court proceedings, even to the point of modifying its permit application and redesigning the Landfill, if necessary, so as to comply with the DEP's requirements.

In its ruling of March 31, 1999 this Court determined, based upon the persuasive authority of *Triple G Landfills, Inc. v. Board of Commissioners of Fountain County, Indiana,* 977 F.2d 287 (7th Cir. 1992) and *Gary D. Peake Excavating, Inc. v. Town Board of the Town of Hancock,* 93 F.3d 68 (2d Cir.1996), that the requirements of standing and ripeness had been satisfied. The Court therefore abided by its original ruling on the point. *See Khodara I,* 91 F.Supp.2d at 836–44. In discussing the issue of ripeness, this Court noted that Eagle's constitutional challenges to the FAA Amendment presented purely legal issues suitable for judicial resolution. The Court also concluded that the potential prejudice which Eagle would suffer in the absence of a judicial resolution weighed in favor of a finding of ripeness. Absent a ruling on the statute's constitutionality, Eagle essentially would have to either forego its past investment and prospective efforts to develop the Landfill in deference to a potentially unlawful statute, or alternatively, invest significant time and money toward the permitting process, not knowing whether it could ultimately raise a successful challenge to the Amendment. *Id.* at 841–44. Thus, there would be significant hardship to Eagle in the absence of a judicial resolution. The tension inherent in this dilemma led the Court to con-

clude that it was faced with a sufficiently "live" controversy for purposes of Article III jurisdiction.

■ Now that this case is before the Court in the context of AIR–21, the Federal Defendants and the Intervenors have once again raised challenges to Eagle's standing. The Federal Defendants contend that Eagle has not suffered any "injury in fact" related to Section 503(d) in that there is no evidence demonstrating that either the DEP or the FAA has issued an opinion regarding the applicability of the Act to the Happy Landing Landfill. The Federal Defendants again point out that the actual injury suffered by Eagle—the suspension of its Solid Waste Permit— occurred because of unrelated state environmental issues, not because of action taken by the FAA. Finally, the Federal Defendants claim that Eagle lacks any redressable injury because of the fact that the Pennsylvania Supreme Court's denial of allocatur acts as a final adjudication of Eagle's quest to overturn the suspension of its Permit.

The Intervenors contend that the Permit became void, both by its own terms and pursuant to 25 Pa.Code § 271.211(e), when no municipal waste was disposed of at the Landfill within five years of its issuance (i.e. February 9, 2001). Thus, according to the Intervenors, Eagle is presently without any valid Solid Waste Permit and must commence the permitting process all over again if it intends to pursue development of the Happy Landing Landfill.

Although these arguments are presented as challenges to Eagle's standing, the Court views them as pertaining more to issues of ripeness. For the reasons previously relied upon in *Khodara I*, the Court once again concludes that the case is sufficiently ripe for review, with one minor exception.[5] First, the relief which Eagle is seeking—a declaration as to the legal meaning of a statutory provision and whether or not it facially applies to the Happy Landing Landfill—involves purely legal issues fit for judicial resolution. *See Triple G Landfills*, 977 F.2d at 289 (lawsuit was ripe for review where it involved purely legal question of whether county ordinance was a "zoning ordinance" and would not be clarified by administrative proceedings or any other type of factual development). The same is true with respect to Eagle's claims that raise facial constitutional challenges to Section 503(d)—these are purely legal issues fit for judicial review. Second, Eagle will suffer significant hardship in the absence of a legal ruling. We note, despite the fact that Eagle's Solid Waste Permit has been finally suspended or possibly even voided, that Eagle still is not entirely without legal recourse with respect to its Solid Waste Permit. At the very least, Eagle retains the option of redesigning its landfill so as to comply with the DEP's present permitting requirements; indeed, it has consistently professed a commitment to do so and there is no evidence presently of record from which we can conclude otherwise.[6] Thus, Eagle still faces the same Hobson's choice to which this Court previously alluded: either forego its past invest-

---

5. The Court concludes that Eagle's second cause of action is not sufficiently ripe for the reasons explained below. This Court therefore concludes that it lacks jurisdiction over that claim.

6. It should be noted that Eagle's professed intention to complete its landfill, even to the point of re-designing it, was a factor that this Court found significant in *Khodara I* in determining that the parties had presented a sufficiently ripe dispute. *See* 91 F.Supp.2d at 843–44.

ments and prospective efforts to develop the Landfill in deference to a statute which may not even apply to Eagle, or alternatively, invest significant time and additional monies in the Landfill not knowing whether Section 503(d) would ultimately be found applicable (and thus, an impediment) to the Happy Landing Landfill. Simply stated, without a judicial resolution of its case, Eagle is put in a hopeless and extremely expensive position of not knowing whether to "fish or cut bait."

The Court therefore agrees with Eagle's position that the status of its Solid Waste Permit is not determinative with respect to standing and ripeness. Even if Eagle is ultimately left with no other recourse but to redesign its landfill and re-commence the state permitting process, we would conclude that it has a cognizable interest in this case and that the issues are ripe for review. *See, e.g., Triple G Landfills, Inc.,* 977 F.2d 287 (in case challenging county ordinance which established stringent landfill permitting criteria, case was ripe even though plaintiff had not yet applied for a state permit or county permit and therefore faced no immediate threat of enforcement under the challenged ordinance). Moreover, while the FAA has not yet acted to officially enforce the statute against Eagle, the fact remains that the Federal Defendants have taken a position as to the meaning of Section 503(d) that is adverse to the interests of Eagle. The potential applicability of the statute creates for Eagle the Hobson's choice to which the Court previously referred.

In sum, as to Counts I, III, IV, V and VI of Eagle's Amended Complaint, a substantial controversy exists between the parties who have adverse legal interests, and the controversy is of sufficient immediacy and reality to warrant a declaratory judgment. *See The St. Thomas–St. John Hotel & Tourism Ass'n, Inc.,* 218 F.3d at 240. A

judicial ruling will conclusively decide the applicability, if any, of Section 503 to the Happy Landing Landfill and would be of significant practical utility to the parties. *See Pic–A–State Pa., Inc.,* 76 F.3d at 1298. We conclude that Eagle has adequate standing to pursue this action and the issues are ripe for review.

The same cannot be said, however, with respect to Eagle's second cause of action. In Count II, Eagle asks this Court to declare as a matter of law that Eagle is exempted from the general restriction of Section 503(d)(1) because operation of the Happy Landing Landfill would not adversely impact aviation safety. This claim, unlike the others raised in Eagle's Amended Complaint, involves a highly fact-intensive determination and is therefore *not* a purely legal issue fit for judicial resolution.

Furthermore, while the FAA has clearly taken a position in this litigation (adverse to Eagle's) with respect to the meaning and applicability of Section 503(d), the Agency has never taken any position as to whether exemption of the Happy Landing Landfill would be appropriate. In fact, nothing in our present record suggests that the relevant state aviation agency has ever requested an exemption on behalf of the Happy Landing Landfill, nor is there any evidence to suggest that Eagle has even pursued this option. Thus, the requisite adversity of legal interests is lacking as to Count II.

Moreover, any determination made by the FAA as to the suitability of an exemption would likely have to be reviewed under the deferential standards set forth in the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* An attempt on the part of this Court to insert itself at this time into the exemption process, without the benefit of a prior ruling by the FAA on the matter, or any official record, would be both premature and completing devoid of

foundational support. Accordingly, there can be no practical utility to a declaratory judgment on Count II and our withholding of judgment does not result in undue hardship to Eagle. We conclude that Eagle's second cause of action is not ripe for this Court's review. Accordingly, that claim will be dismissed without prejudice for lack of jurisdiction.

## B. Leatherwood

The Federal Defendants raise a similar challenge with respect to Leatherwood's standing on the grounds that the FAA has taken no adverse action against it. The FAA contends that the actual injuries suffered by Leatherwood—the suspension of its permits and non-review of its Bird Control Plan—were the result of decisions made by the DEP, not the FAA. Although the DEP based its decisions in part on the FAA's Advisory Circular, the FAA points out that this document is meant to provide guidance in construing the statute and is not binding on the public. Thus, it is urged, the FAA never committed any act which adversely impacted Leatherwood's interests.

Like the challenges raised to Eagle's standing, we find this argument to be lacking in merit. As noted above, standing requirements are satisfied in the context of a declaratory judgment action "when 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *The St. Thomas–St. John Hotel & Tourism Ass'n, Inc.*, 218 F.3d at 240 (quoting *Step–Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990)). In light of the significant investment Leatherwood has made toward the completion of its landfill, in terms of both time and money, it can hardly be denied that there is a substantial controversy presented in this litigation. Further, it is clear that the FAA and Leatherwood have adverse legal interests as evidenced by the FAA's interpretation of Section 503, which ultimately precludes Leatherwood from continuing with the development of its landfill. In addition, the utility of a declaratory judgment in this action is shown by the same concerns that we addressed in our discussion of Eagle's standing to bring suit. Like Eagle, Leatherwood is faced with the dilemma of not knowing whether to pursue further litigation in relation to its state permits or whether to cut its losses in the face of a federal statute which may impose an insurmountable barrier to its landfill. The controversy, therefore, is of sufficient immediacy and reality to warrant resolution by this Court. We find that Leatherwood has sufficient standing to proceed with this action.

## IV. ELEVENTH AMENDMENT IMMUNITY

We next turn to the Commonwealth Defendants' assertion that Leatherwood's claims against them are barred by the Eleventh Amendment to the United States Constitution, which states that:

> The Judicial power of the United States shall not be construed to extend to suit in law or equity, commenced or prosecuted against one of the United states by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST., AMEND. XI. Although the Amendment on its face does not apply to suits brought against states by their own citizens, constitutional jurisprudence has long recognized that a state is immune from such actions. *See e.g., Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 145–46, 113 S.Ct. 684,

121 L.Ed.2d 605 (1993); *Hans v. Louisiana*, 134 U.S. 1, 13–14, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Two well known exceptions apply where (1) Congress has enacted a statute abrogating that immunity pursuant to its authority to enforce Section 5 of the Fourteenth Amendment, or (2) a state has waived its immunity. *See College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). In addition, a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the doctrine set forth in *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See Alden*, 527 U.S. at 757.

Leatherwood does not dispute the fact that it is barred from pursuing its case against the DEP. *See Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir.2002) (state agencies and departments are generally immune from suits by private parties in federal court when the state is the real party in interest). Accordingly, the Commonwealth's motion for summary judgment is granted insofar as it relates to any claims against the DEP.

Leatherwood nevertheless maintains that it is permitted to pursue its action against Kelly Burch, the current Regional Director of the DEP under the doctrine of *Ex Parte Young*. At the same time, it has professed a willingness to dismiss this claim in exchange for assurances by the DEP that the Agency will abide by any decision rendered by this Court. Those assurances have since been provided in writing by counsel for the DEP and the Court has been advised that a stipulation for voluntary dismissal under Rule 41(a)(1)(ii) will be forthcoming. However, in light of the Court's ruling regarding the meaning of § 503(d)(2) of AIR–21, summary judgment is appropriate in favor of Mr. Burch because, as a matter of law, Leatherwood cannot obtain the declaration against Mr. Burch which it originally sought. Accordingly, the DEP's motion for summary judgment will be granted in that respect as well.

## V. SOVEREIGN IMMUNITY AND THE ADMINISTRATIVE PROCEDURES ACT

We next address the Federal Defendants' claim that Leatherwood's suit is barred by the doctrine of sovereign immunity. It is axiomatic that the United States may not be sued without its consent. *Minnesota v. United States*, 305 U.S. 382, 388, 59 S.Ct. 292, 83 L.Ed. 235 (1939). Moreover, because sovereign immunity is jurisdictional in nature, federal courts have no jurisdiction to entertain a claim against the United States or its agencies or officials unless there is a clear waiver of the immunity by the government. *See FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

The Federal Defendants contend that the only conceivable waiver of sovereign immunity for purposes of this lawsuit is that which is contained in the Administrative Procedures Act, 5 U.S.C. § 702. It follows, the Federal Defendants argue, that Leatherwood's claims must be reviewed in accordance with the procedural framework set forth in the APA. Consequently, the Federal Defendants maintain that our review is limited to the "administrative record" and that we should accord deference to the FAA's interpretation of Section 503.

Although the Court agrees that the APA provides the necessary waiver of sovereign immunity, we do not agree that the case necessarily must proceed as an action un-

der the APA. Section 702 states, in relevant part:

> ... An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party... Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C.S § 702 (Lexis 1989).

■ The Third Circuit has held that Section 702 waives sovereign immunity in equitable actions seeking "nonstatutory" review of agency action under 28 U.S.C. § 1331.[7] *See Jaffee v. United States*, 592 F.2d 712, 718–19 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). "Nonstatutory" review describes those situations where a party's suit is not brought under a statute that explicitly provides for review of agency action. *See id.* at 718 n. 12. In *Jaffee*, the plaintiff was a former member of the United States Army who had been ordered to be present at the site of a nuclear weapons test in 1953. He sought, among other things, a court order directing the United States to issue a warning to all members of the affected class concerning the medical risks facing them as a result of their unprotected exposure to massive doses of radiation. The Third Circuit ruled that sovereign immunity would not bar that part of the lawsuit that sought nonmonetary relief against the United States in the form of the court-ordered warning. 592 F.2d at 718–19. Numerous other cases likewise support the proposition that Section 702's waiver of sovereign immunity extends to nonstatutory review cases that are not brought under the APA *per se. See Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1328 (D.C.Cir.1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C.Cir.1984) (former employee of Library of Congress could bring non-monetary claims against Library even though Library was not "agency" under the APA); *Dronenburg v. Zech*, 741 F.2d 1388, 1390–91 (D.C.Cir.1984) (federal court was not barred by sovereign immunity from entertaining non-monetary claims challenging the legality and constitutionality of a military discharge); *Johnsrud v. Carter*, 620 F.2d 29, 30–32 (3d Cir.1980) (plaintiff not barred by sovereign immunity from seeking equitable relief in the form of a warning by the President to residents exposed to leakage of radioactive material from Three Mile Island); *Cobell v. Babbitt*, 30 F.Supp.2d 24, 31 (D.D.C. 1998) ("The § 702 waiver of sovereign immunity in actions seeking relief other than money damages against the government also applies to claims brought outside the purview of the APA...").

Based on this authority, the Court holds that sovereign immunity does not bar Leatherwood's non-monetary claims against the FAA and its Administrator, Jane Garvey. We further conclude that the procedural mandates of the Administrative Procedures Act are not controlling

---

**7.** Leatherwood has cited 28 U.S.C. § 1331 as well as the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, in support of this Court's jurisdiction.

here, as this case does not arise under the APA. With that understanding, we proceed to the merits of the underlying dispute.

## VI. INTERPRETING SECTION 503(d) OF "AIR–21"

■■■ In this case we are asked to interpret the language of Section 503(d) of AIR–21, which was enacted on April 5, 2000 and is codified at 49 U.S.C. § 44718(d). That provision states:

(1) In general.—No person shall construct or establish a municipal waste solid waste landfill . . . that receives putrescible waste . . . within 6 miles of a public airport that has received grants under chapter 471 and is primarily served by general aviation aircraft and regularly scheduled flights of aircraft designed for 60 passengers or less unless the State aviation agency of the State in which the airport is located requests that the Administrator of the [FAA] exempt the landfill from the application of this subsection and the Administrator determines that such exemption would have no adverse impact on aviation safety.

(2) Limitation on applicability.—Paragraph (1) shall not apply in the State of Alaska and shall not apply to the construction, establishment, expansion, or modification of, or to any other activity undertaken with respect to, a municipal solid waste landfill *if the construction or establishment of the landfill was com-*

*menced on or before the date of the enactment of this subsection.*

49 U.S.C. § 44718(d) (emphasis supplied).

The heart and soul of this litigation concerns the parties' varying interpretations of the phrase "if the construction or establishment of the landfill was commenced on or before [April 5, 2000]." Eagle and Leatherwood contend that Section 503(d)(2) is facially unambiguous and that we should apply the plain dictionary meaning to the terms "construction," "establishment," and "commence." Accordingly, Plaintiffs posit that the term "establish" means "to bring into existence, to bring about." Listing a litany of activities in which it has engaged over several years,[8] Eagle contends that it "commenced establishment" of the Happy Landing Landfill— i.e., began the process of bringing the Landfill into existence—as early as 1990 and, in any event, prior to April 5, 2000. Leatherwood claims that it commenced the establishment of the Jefferson Landfill as early as 1989 when it began work necessary for the preparation of its application for a Solid Waste Permit and no later than July 31, 1991 when the formal application was submitted to the DEP. Both Plaintiffs contend that their respective landfills were formally "established" upon the issuance of a Solid Waste Permit by the DEP: May 12, 1995 for the Jefferson Landfill and

---

**8.** Eagle posits that it commenced the establishment of the landfill by, *inter alia,* purchasing properties on which to locate the landfill, litigating the conveyance of those properties, engaging engineering consultants and engineers to prepare necessary applications and perform various geological, hydrogeological, environmental and other professional studies, applying for and securing its required permits from the DEP, securing Township conditional use approval for the landfill as well as approval to relocate a particular Township road, securing permits from the Pennsylvania De-

partment of Transportation, the Public Utility Commission and the Army Corp of Engineers, entering into a host community agreement and litigating third-party challenges to the agreement, and actively engaging in certain physical work, including (among other things) the boring of 22 holes for geological interpretation, the installation of twelve groundwater monitoring wells, the drilling and analyzing of forty-seven soil test pits, and excavation relative to the landfill access road. (*See* Eagle's Mem. of Law in Supp. of Mot. for Summ. Judg. at pp. 7–8).

February 9, 1996 for the Happy Landing Landfill.

With respect to the term "construction," Plaintiffs advocate the dictionary definition "to make or form by combining or arranging parts or elements; BUILD." Leatherwood claims that it commenced construction of the Jefferson Landfill as early as 1990 when various extensive heavy construction activities were performed on its landfill site. It claims that construction was commenced no later than 1995 when, following the issuance of its Solid Waste Permit, it completed the installation of several ground monitoring wells, which are designated a "major construction activity" in its Solid Waste Permit. Eagle avers that it commenced construction by engaging in a host of activities between February 9, 1996 and April 5, 2000, including preliminary excavation work relative to its landfill access road and excavation relative to the installation of twelve groundwater monitoring wells, the latter being completed in 1996. In sum, under the Plaintiffs' respective interpretations of the statute, both the Happy Landing Landfill and the Jefferson Landfill would be excepted from Section 503(d)(1)'s general prohibition because "construction" had been "commenced" and/or "establishment" had been "commenced" with respect to each landfill prior to April 5, 2000.

By contrast, the Intervenors and Federal Defendants argue that the phrase—"if the construction or establishment of the landfill was commenced"—is ambiguous, and they urge this Court therefore to rely on materials apart from the statutory language itself, particularly the FAA's Advisory Circular. That document provides the following key definitions:

a. *Construct a municipal solid waste landfill* means excavate or grade land, or raise structures, to prepare a municipal solid waste landfill as permitted by the appropriate regulatory or permitting authority.

b. *Establish a municipal solid waste landfill (MSWLF)* means receive the first load of putrescible waste on site for placement in a prepared municipal solid waste landfill.

c. *Existing municipal solid waste landfill (MSWLF)* means a municipal solid waste landfill that received putrescible waste on or before April 5, 2000.

Applying these definitions to the case at hand, the FAA maintains that neither the Happy Landing Landfill nor the Jefferson Landfill is covered by the exception in Section 503(d)(2), *to wit:* neither landfill had "commenced their establishment" because neither was actually accepting waste as of April 5, 2000, and neither landfill had "commenced construction" because neither one had its permits in place and was actively excavating, grading land, or raising structures as of April 5, 2000. Thus, under the FAA's interpretation of Section 503(d), both landfills are precluded from further development unless the state aviation committee requests, and the FAA Administrator grants, an exemption based on a finding that there would be no adverse impact on aviation safety. *See* 49 U.S.C. § 44718(d)(1).

All parties agree that our underlying endeavor in interpreting Section 503(d)(2) is to give effect to Congress's intent. *See Rosenberg v. XM Ventures,* 274 F.3d 137, 141 (3d Cir.2001). In ascertaining Congress's intent, we must examine the language of the statute in question; if the language is plain and unambiguous, our inquiry is at an end. *Valansi v. Ashcroft,* 278 F.3d 203, 209 (3d Cir.2002); *Rosenberg,* 274 F.3d at 141. In determining whether the statutory language is ambiguous, however, we are required to examine "the language itself, the specific context in

which that language is used, and the broader context of the statute as a whole." *Valansi,* 278 F.3d at 209 (quoting *Marshak v. Treadwell,* 240 F.3d 184, 192–93 (3d Cir.2001)); *Rosenberg,* 274 F.3d at 141. *See also Becker v. Mack Trucks, Inc.,* 281 F.3d 372, 380 (3d Cir.2002) (In construing a statutory provision courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (quoting *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Amer.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)), *pet. for cert. denied,* —— U.S. ——, 123 S.Ct. 93, 154 L.Ed.2d 24.

The operative phrase with which we are concerned is § 503(d)(2)'s exception for landfills whose "construction or establishment ... was commenced on or before [April 5, 2000]." 49 U.S.C. § 44718(d)(2). We agree with the Plaintiffs that the word "commenced" appears to modify both "construction" and "establishment." Thus we must focus our inquiry on what Congress meant by "commencing construction" or "commencing the establishment" of a landfill.

Unlike the Plaintiffs, we do not believe that the terms "commence construction" and "commence establishment" are clear and unambiguous considering the specific context in which they are used and the broader context of the statute as a whole. As this litigation has aptly illustrated, the process of developing a landfill is exceptionally complex and involves a host of regulatory issues at every level of government and at every phase of development. There are a multiplicity of steps, often times overlapping, which must be under-

taken with regards to various environmental, geological, and hydrogeological concerns. Apart from satisfying federal and state regulatory requirements, a prospective landfill operator is required to obtain, at the local level, a community host agreement, a building permit, and a zoning permit, to name a few. Thus, in the specific context of a landfill, it is particularly difficult to ascertain when "construction" has begun and when "establishment" has been accomplished, let alone "commenced."

In fact, the varying interpretations of Section 503(d) offered by the parties highlight the ambiguity inherent in the statute. Under Leatherwood's interpretation of the term "establishment," for example, the process of establishing a landfill would logically precede the process of constructing the landfill, since construction generally cannot begin until after a solid waste permit is obtained. Similarly, the types of activities which Eagle claims commenced the process of establishment (purchasing land, hiring consultants, etc.) logically precede the commencement of construction. In contrast, under the FAA's and Intervenors' interpretation as set forth in the Advisory Circular,[9] construction logically precedes the establishment of the landfill, since establishment would not occur until the point when the landfill actually receives waste. As is readily apparent, these two competing interpretations lead to different applications of the statute and potentially differing legal results.

To further highlight the statute's inherent ambiguity, even the Plaintiffs are not completely uniform in their interpretations of § 503(d)(2)'s supposedly unambiguous language. While Leatherwood defines the "commencement of establishment" as basi-

---

9. At this point in our analysis, we are not relying on the Advisory Circular as a substantive source of information supplying the meaning of the relevant terms. Rather, we consider it only as a potentially viable and alternative interpretation of Section 503(d)(2) for the sake of evaluating the statute's ambiguity.

cally those activity related to a good faith effort to obtain a Solid Waste Permit, Eagle has cited activities such as purchasing property on which to locate the landfill, litigating the conveyance of property, and hiring engineers to conduct preliminary viability assessment studies. Neither party has identified for this Court the precise moment in time when the "establishment" or "construction" of its landfill was actually "commenced." Rather, both Plaintiffs seem to suggest that the "commencement of establishment" and/or the "commencement of construction" could occur at any point on a sliding temporal scale without being either willing or capable of identifying the specific point at which time it occurs, once again bespeaking the inherent ambiguity in the statute.

We are further convinced of Section 503(d)(2)'s ambiguity when we consider it in the broader context of Congress's findings. In enacting § 503(d), Congress specifically found that:

(1) collisions between aircraft and birds have resulted in fatal accidents;

(2) bird strikes pose a special danger to smaller aircraft;

(3) landfills near airports pose a potential hazard to aircraft operating there because they attract birds;

(4) even if the landfill is not located in the approach path of the airport's runway, it still poses a hazard because of the birds' ability to fly away from the landfill and into the path of oncoming planes;

(5) while certain mileage limits have the potential to be arbitrary, keeping landfills at least 6 miles away from an air-

port, especially an airport served by small planes, is an appropriate minimum requirement for aviation safety;

(6) closure of existing landfills (due to concerns about aviation safety) should be avoided because of the likely disruption to those who use and depend on such landfills.

*See* Pub.L. 106–181, § 503(a), 114 Stat. 61, 133 (2000).

■■■ These findings underscore a concern with the danger posed by landfills located in the vicinity of airports, particularly those serving smaller planes, because of the potential for bird-aircraft collisions. At the same time, however, Finding No. 6 evidences Congress's reluctance to inconvenience those who may use and depend on such landfills insofar as it recognizes that "closure of existing landfills ... should be avoided.." Pub.L. 106–181, § 503(a)(6), 114 Stat. 61, 133 (2000). The term "existing landfills" is not defined in the statute and, although we might presume that an "existing landfill" is coterminous in some fashion with one whose "construction" or "establishment" has commenced, this hardly advances the ball. Just as it is difficult to discern when "construction" is officially underway or when "establishment" has been accomplished, it is similarly difficult to know when a landfill formally comes into "existence." Thus, the boundaries of Congress's intended exception for "existing landfills" is not apparent from the language of the statute, and we are still left wondering when the "construction" or "establishment" of a landfill has been commenced.[10] Those terms, we think, are undeniably unclear in their meaning.

---

**10.** We are not persuaded by the suggestion that this Court previously determined, as a matter of law, that Eagle (and by implication, Leatherwood) commenced the construction or establishment of its landfill prior to April 5,

2000. Citing to *Khodara I,* Eagle directs this Court to the following passages:

Upon being initially permitted, Eagle undertook some measures to develop the landfill. While the parties disagree on the ex-

Because we conclude that § 503(d)(2) is ambiguous, we may consider other sources apart from the statute itself, including the FAA's Advisory Circular, in ascertaining its meaning. Not surprisingly, the parties disagree with respect to the level of deference, if any, that should be accorded the Advisory Circular. The FAA takes the position that the Advisory Circular should be given the highest level of deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* an agency's interpretation of a statute should be upheld unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. *Id.* 467 U.S. at 843–44, 104 S.Ct. 2778. Plaintiff Leatherwood disputes that *Chevron* deference applies and further contends that the Advisory Circular should be completely disregarded as unpersuasive under the factors set forth in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

We think it is clear that this is *not* a case where the agency's interpretation is entitled to *Chevron*-type deference. We are not dealing here with the type of formal agency regulation or adjudication issued in the exercise of authority which Congress intended to have the force of law. *See United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). In fact, by its own terms the Advisory Circular is clearly meant merely to provide guidance to various parties who may be affected by Section 503(d)'s provisions. *See, e.g.,* Advisory Circular at ¶ 1 ("This advisory circular (AC) provides *guidance* on complying with new Federal statutory requirements regarding the construction or establishment of landfills near public airports.") (emphasis supplied); *id.* at ¶ 2 ("The *guidance* contained in the AC is provided by the . . . (FAA) for use by persons considering the construction or establishment of a municipal solid waste landfill (MSWLF) near a public airport. *Guidance* contained herein should be used to comply with recently enacted MSWLF site limitations contained in 49 U.S.C. § 44718(d) . . .") (emphasis supplied). The Supreme Court has made clear that "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris*

---

tent to which Eagle actually commenced "construction" of the landfill, this disagreement is for the most part a dispute more of semantics than facts. For example, it appears to be undisputed that Eagle obtained engineering studies and undertook steps to install 11 monitoring wells.

\* \* \* \* \* \*

It is undisputed, for example, that, at the time of the FAA Amendment's Enactment, the state of the landfill was such that at least some initial measures toward development had been undertaken. For example, thee appears to be no dispute that Eagle had obtained engineering studies and had

installed 11 groundwater monitoring wells. It is equally clear that a number of steps had not been undertaken that presumably would have been essential to the completion of the landfill...

*Khodara I,* 91 F.Supp.2d at 831, 847. One thing is clear, however: in addressing the parties' claims in *Khodara I,* the Court was not called upon to construe the language of Section 503(d)(2) or to give meaning in particular to the phrase "commence construction," as used therein. Accordingly, we do not view the foregoing passages as establishing any binding conclusions under the "law of the case" doctrine.

*County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (citing cases). *See also Madison v. Resources for Human Development, Inc.,* 233 F.3d 175, 186 ("We have made clear that agency interpretive guidelines 'do not rise to the level of a regulation and do not have the effect of law.'") (citing *Brooks v. Village of Ridgefield Park,* 185 F.3d 130, 135 (3d Cir. 1999)). Thus, the Advisory Circular does not merit controlling weight.

 Rather we think that the Advisory Circular is "entitled to respect" under the Supreme Court's decision in *Skidmore v. Swift,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but "only to the extent [it has] the 'power to persuade.'" *Madison,* 233 F.3d at 186 (citing to *Christensen, supra*) (footnote omitted). In *Skidmore,* the Court explained:

> [R]ulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. at 140, 65 S.Ct. 161.

Applying the *Skidmore* standard, this Court accepts the interpretation proffered by the Advisory Circular because we ultimately find it to be a logical and persuasive interpretation of Congress's true intent. We disagree, as an initial matter, with Leatherwood's contention that the Advisory Circular has nothing to do with the FAA's area of "core expertise." The

parties concede that the FAA is the agency charged with interpretation and enforcement of AIR–21. *See* 49 U.S.C. § 46301(a)(3)(C). Further, all parties agree that the FAA has expertise in the area of air traffic safety. While the area of landfill regulation is not uniquely within the expertise of the FAA, we cannot say that § 503's interpretation and enforcement is wholly divorced from issues of air traffic safety. At the end of the day, the scope of the prohibition on landfills near airports directly implicates aviation safety concerns.

Moreover, the process by which the Advisory Circular was produced evidences a degree of thoughtfulness and thoroughness befitting of some deference. Following enactment of the statute, the FAA received various requests for information concerning the meaning and applicability of Section 503. The FAA determined that the statute was self-executing but it also decided that some guidance short of formal rule-making was necessary. The process of drafting the Advisory Circular occurred over a three month period from May 2000 to August 26, 2000 and involved many revisions. During the drafting process, informal discussions were held among various FAA personnel regarding all aspects of the Advisory Circular. A preliminary draft was circulated to the U.S. Environmental Protection Agency for its input. The final draft was circulated to personnel in the Office of Airports and the Office of Chief Counsel for their concurrence prior to its official adoption and promulgation.

Notably, during the process of draft revision, the FAA had the benefit of a letter, dated May 30, 2000, from the House Committee on Transportation and Infrastructure and its Subcommittee on Aviation,[11]

---

11. The letter was signed by Bud Shuster, Chairman of the Committee on Transporta-

which purported to give some clarity to the new statutory provision.[12] One of the signatories to the letter was Representative Bud Shuster, then Chairman of the House Committee and the primary proponent of Section 503. Thus, in drafting the Advisory Circular, the FAA had the benefit of input from the Congressional Committee and Subcommittee primarily responsible for § 503's enactment.

Ultimately, in publishing the final version of the Advisory Circular, the FAA adopted the key definitions set forth above pertaining to "construction" and "estab-

lishment" of municipal solid waste landfills. The Advisory Circular explains that:

> The limitations of § 44718(d), as amended, only apply to a new MSWLF [municipal solid waste landfill] (constructed or established after April 5, 2000). The statutory limitations are not applicable where (construction or establishment of a MSWLF began on or before April 5, 2000). Further, an existing MSWLF that is expanded or modified after April 5, 2000, would not be held to the limitations of § 44718(d), as amended.

tion & Infrastructure, James L. Oberstar, Ranking Democratic Member of the Committee, John J. Duncan, Jr., Chairman of the Aviation Subcommittee, and William O. Lipinski, Ranking Democratic Member of the Aviation Subcommittee. (*See* Def. FAA's Mem. in Supp. of its Mot. for Summ. Judg., Ex. 2.)

**12.** The letter states:

Dear Administrator Garvey:

A few weeks ago, the President signed the Aviation Investment and Reform Act for the 21st Century (AIR 21). This landmark legislation unlocked the aviation trust fund to ensure that money would be available for important safety and capacity enhancement projects.

One of the safety initiatives in this bill is the provision in section 503 that prohibits landfills from being built within 6 miles of a public airport. That provision was included because landfills tend to attract birds and birds pose a hazard to aircraft, especially small aircraft, departing or approaching an airport.

Given the important safety benefits of section 503, we are writing to urge your agency to construe this provision in accordance with the clear intent of the statutory provision.

It is important to note that section 503 applies only to small airports. Therefore, the interpretation we are advocating would not affect the large airports that often have significant tracts of land that are used as buffers and on which no runways would ever be built.

Also, section 503 applies only to new landfills and does not apply to the expan-

sion of existing landfills, i.e. those where "earth has already been turned" to begin the construction or establishment of the landfill. This limitation should mitigate any hardship a strict interpretation of the statute would cause.

Section 503 states that "no person shall construct or establish a ... landfill ... within 6 miles of a public airport ..." In our view, this means that in determining whether a particular landfill is prohibited, one should measure from the boundary of the airport to the boundary of the landfill.

However, it is our understanding that under Advisory Circular 150/5200-33, FAA would, for landfill siting purposes, measure the 6 miles as the distance from the aircraft movement area to a cell within the new landfill. We are concerned that this interpretation will allow landfills to be built that could endanger public safety. This is because, under FAA's Advisory Circular, new runways could be built or cells could be added to the newly built landfill that would be within the 6-mile statutory prohibition. It would therefore seem best to prohibit any landfills within 6 miles of an airport's boundary even if the runways and cells would currently be more than 6 miles apart.

Therefore, for the sake of aviation safety, we urge you to measure from the boundary of the airport to the boundary of the landfill in determining compliance with Section 503.

\*　　\*　　\*　　\*　　\*　　\*

(Def. FAA's Mem. in Supp. of its Mot. for Summ. Judg., Ex. 2.)

(Advisory Circular 150/5200–34 at ¶ 7, "Landfills Covered by the Statute"). The FAA contends that its Advisory Circular provides a reasonable and consistent interpretation of § 503(d). Given the variation among the states as to their myriad regulatory schemes pertaining to the development and operation of solid waste landfills, the FAA maintains it is reasonable that its definition for "construction of a municipal solid waste landfill" is tied to the landfill's individual permit status as of the date of AIR–21's enactment. Further, the FAA maintains it was reasonable to interpret activities such as the installation of ground monitoring wells, soil samplings and percolation tests as pre-construction activities, since those activities have more to do with assessing the viability of the landfill than actively constructing it.

We agree with the FAA that its Advisory Circular represents a reasonable and persuasive interpretation of Section 503(d) under the factors delineated in *Skidmore*. Apart from the factors previously discussed, we think that the Advisory Circular comports with the Congressional findings that accompany Section 503(d)(1) and (2). As we previously noted, Congress's findings display its intent to enact a broad prohibition against new landfills (i.e., those commencing construction or establishment after April 5, 2000) within six miles of those public airports serving predominantly smaller aircraft. Counterbalanced with this broad prohibition is Congress's concern, set forth in Finding No. 6, for avoiding disruption to those who may depend on "existing" landfills. While Finding No. 6 does not define "existing landfill," its focus on the needs of those who "use" and "depend on" landfills, rather than the investment concerns of the landfill developer, suggests that Congress intended a more narrow definition of the term "existing landfills"—i.e., one whose closure would upset the settled expectancy interests of

its patrons. The Advisory Circular generally comports with this intent in defining an "existing" landfill as one that was receiving waste on or before April 5, 2000. (*See* Advisory Circular, Appendix 1., ¶ c.)

■■■ The Advisory Circular also sets forth reasonable interpretations of the terms "construct" and "establish" a municipal solid waste landfill. Applying those definitions, § 503(d)(2) excepts three distinct categories of landfills from the general 6–mile prohibition: (i) landfills within the 6–mile zone that had begun receiving waste (i.e., commenced their establishment) on or before April 5, 2000; (ii) landfills within the 6–mile zone that, although not yet fully operational, had their permits in place and were actively excavating, grading land, or raising structures to prepare a landfill (i.e., had commenced construction) as of April 5, 2000; and (iii) landfills "established" as of April 5, 2000 which might later be modified or expanded to accept waste within the 6–mile zone. This interpretation, we think, strikes the proper balance between the broad prohibition against new landfills that Congress intended on one hand, and protection for those landfills on the other hand that were far enough along in their development, as of April 5, 2000, such that closure would work a hardship on its current and future patrons. It also comports with Congress's intended exception for the post-April 5, 2000 expansion or modification of landfills that were fully operational as of AIR–21's enactment, thus further accommodating the needs of those persons using and depending on "existing" landfills.

Plaintiffs' interpretation of the statute, on the other hand, is at odds with Congress's intent because it creates an exception that is too broad. It would except from the prohibition, e.g., an inchoate landfill where the developer had merely pur-

chased the property on which the landfill site would be developed, one whose developer had done no more than conduct preliminary soil testing, or one whose developer had only just begun the very lengthy and complex process of completing a solid waste permit application. As the Intervenors contend, the Plaintiffs' proposed exception could encompass even those situations where the landfill was little more than a "gleam in the eye" of the developer. We think this is contrary to Congress's intent as expressed in Finding No. 6.

The Court also considers the Advisory Circular to be the more plausible interpretation of Congressional intent in view of the historical application of 49 U.S.C. § 44718(d). We note that where, as here, we are dealing with an amended statute, the history of the statute is particularly pertinent. See, e.g., Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 551, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (In construing the pre-emption provision of the Federal Cigarette Labeling and Advertising Act, the Court was "aided in [its] interpretation by considering the predecessor pre-emption provision and the circumstances in which the current language was adopted."). Some background discussion is therefore necessary regarding the predecessor to Section 503(d).

Section 1220 of FARA, enacted on October 9, 1996, prohibited persons from "constructing" or "establishing" a landfill whenever "2 landfills [had] been proposed to be constructed or established within 6 miles of a commercial service airport with fewer than 50,000 enplanements per year" and certain other circumstances existed.[13] As the parties here well know, this Court in Khodara I ruled that § 1220's prohibition applied to the Happy Landing Landfill because the latter was one of two landfills "proposed to be constructed or established" within the specified criteria (Leatherwood being the other) and because the Landfill did not fit within the exception created for those that were "already active" as of FARA's enactment date. See 91 F.Supp.2d at 849. The Court further ruled that the statute violated Eagle's right to equal protection of the laws in that it created a classification so grossly under-inclusive that it bore no rational nexus to Congress's legitimate interest in enhancing aviation safety. Id. at 851–52.[14] Most notable was the fact that the statute's practical application, given its highly specific criteria, was limited to only two landfills in all of the nation: the Happy Landing Landfill and the Leatherwood Landfill. See 91 F.Supp.2d at 851, 853. See also, Khodara Environmental, Inc. v. Beckman, 237 F.3d 186, 189–90 (3d Cir.2001) ("[A]s the FAA has admitted on appeal, the 1996 Amendment's extremely narrow criteria affected only Happy Landing, out of all the landfills in the country."). Indeed, the Third Circuit noted that FARA's legislative his-

---

13. As we noted in Khodara I, § 1220 applied only where: (a) two landfills have been proposed to be constructed or established (b) within six miles of a commercial service airport (c) that has fewer than 50,000 enplanements per year and (d) one of the landfills has been cited by the FAA as incompatible with aircraft operations (e) within the three years prior to the enactment of the statute and (f) the subject landfill is not already active as of the enactment of the statute and (g) the airport operator has not consented to the construction or establishment of the subject landfill. See Khodara I, 91 F.Supp.2d at 850–51.

14. In a footnote, we observed that the statute could be considered over-inclusive in one respect: it tied the fate of one, potentially safe landfill to the FAA's determination that a second, "unsafe" landfill was not compatible with airport operations. See 91 F.Supp.2d at 853 n. 27. Notwithstanding this observation, the clear focus of this Court's constitutional criticisms was the irrational under-inclusiveness of § 1220. See generally id. at 851–53.

tory suggested it had been intended to single out the Happy Landing Landfill for regulation based on post-enactment comments made by Rep. Bud Shuster, then Chairman of the House Committee on Transportation and Infrastructure and the primary sponsor of the legislation. *See id.* at 190 n. 4. In short, it is undeniable that the restriction in § 503(d)'s predecessor was intended to apply to the Happy Landing and Leatherwood Landfills.

Following this Court's ruling on the equal protection issue, and while that issue was pending before the Court of Appeals, Congress amended 49 U.S.C. § 44718(d) by enacting Section 503(d) of AIR–21. The Third Circuit held that AIR–21 mooted Eagle's constitutional challenges, observing that AIR–21 "significantly broadened" the scope of the statute and "does not work to single out the Happy Landing site for exceptional treatment." 237 F.3d at 192. *See also id.* at 193 ("The scope of the 2000 Amendment is substantially broader than that of the challenged law. The restrictive criteria and purely retrospective nature of the old statute ... effectively limited its application only to the Happy Landing and Leatherwood landfills. The new provision, however, applies prospectively to a wide variety of landfills."). The Third Circuit next concluded that vacatur of this Court's prior constitutional ruling was appropriate. 237 F.3d at 195. Rejecting Eagle's argument that Congress had misused the legislative process in amending FARA, the Third Circuit observed that "the new legislation could just as credibly be viewed as a commendable

effort 'to repair what may have been a constitutionally defective statute.'" *Id.* at 195 (citation omitted).

This Court agrees and, in fact, we do view § 503 as an attempt by Congress to address those constitutional concerns that previously inhered in 49 U.S.C. § 44718(d), most obviously the concern that it created an irrationally under-inclusive class. Admittedly, the legislative history is sparse insofar as § 503(d) is concerned.[15] We note, however, that in enacting § 503(d)(2), Congress had the benefit of this Court's ruling that the Happy Landing and Jefferson Landfills were landfills "proposed to be *constructed* or *established*," and not "already active" within the meaning of § 1220. It is logical to infer that Congress equated the concept of landfills "proposed to be constructed or established" with those whose construction or establishment had not yet commenced.

Furthermore, it is significant that Representative Shuster, the original drafter of § 1220, was also the principal proponent of Section 503. In amending former § 1220, Representative Shuster would have had the benefit of this Court's ruling in *Khodara I*, wherein we discussed in detail the various aspect in which we found § 1220 to be irrationally under-inclusive. It is logical to infer that § 503(d) was intended to alleviate the previous concerns with § 1220's under-inclusiveness by significantly broadening the reach of the statute's prohibition. That having been said, we think it highly unlikely that Congress,

---

**15.** The only reference we have located is in the Joint Explanatory Statement of the Committee of Conference set forth in the House Conference Report. It indicates merely that the original version of the House Bill was intended to "[p]rohibit[ ] new landfills within 6 miles of a small airport" unless exemption were granted by the FAA on the ground that the landfill "would not adversely affect air

safety." In the Conference's substituted version, which was renumbered Section 503, the House Bill was accepted with the modifications that Section 503 would not apply to landfills in Alaska or to the expansion of "existing" landfills. *See* "Joint Explanatory Statement of the Committee of Conference" as set forth in the House Conference Report 106–513 at § 101, pp. 123–24.

in seeking to *broaden* the class of affected landfills would have enacted legislation that *excludes* the two landfills previously prohibited under § 1220. By definition, the broadening of a class suggests that those formerly encompassed within the class remain so. The Advisory Circular is consistent with this view; the Plaintiffs' interpretation obviously is not. For all of these reasons, we think the Advisory Circular is a reasonable and persuasive interpretation of Congress's intent in enacting § 503(d).

 Plaintiffs take issue with the FAA's Advisory Circular in a number of respects which we will attempt to address

seriatim. Leatherwood is critical of the Advisory Circular, in part, because the FAA in drafting the document did not consult with the DEP, which Leatherwood evidently considers to be the only agency with expertise in determining what constitutes the "establishment" or "construction" of a landfill.[16] It appears, however, that during the drafting process the FAA consulted in some fashion with the EPA, an agency that clearly has some insight and expertise relative to the process of a landfill development. Moreover, given the national application of § 503(d), we think the FAA can hardly be faulted for failing to premise its interpretation of the statute on

---

**16.** The Plaintiffs contends that the FAA should have looked to the Pennsylvania Solid Waste Management Act, 35 Pa.C.S.A. §§ 6018.101 *et seq.*, the implementing regulations, and the language of their Solid Waste Permits in defining the terms "construction" and "establishment." For example, under the administrative regulations, a "municipal waste landfill" is defined as a "facility for disposing of municipal waste." *See* 25 Pa. Code § 271.1. A "facility," in turn, is defined as "[l]and, structures and other appurtenances or improvements where municipal waste disposal ... *is permitted* or takes place." *Id.* (emphasis supplied). Thus, obtaining a solid waste permit is all that is needed in order to be an "established" landfill under Pennsylvania law, according to the Plaintiffs. Further, in defining the term "construction," Leatherwood relies on ¶ 24 of its Solid Waste Permit, which defines the installation of the groundwater monitoring system as a "major construction activity."

The Court does not find this argument persuasive. Specifically, we do not think that Congress's reference to landfills whose "construction or establishment had commenced" was premised specifically on the regulations issued under the Pennsylvania law and therefore, we cannot be bound by any interpretation that is dependent upon them. Congress surely was aware in enacting AIR–21 that each state has its own regulatory scheme in the area of solid waste disposal—each with their own unique definitions, some of which may differ in material respects from Pennsyl-

vania's. Therefore, this Court is reluctant to premise any interpretation of § 503(d)(2) on the specific definitions set forth in the Pennsylvania regulations absent some explicit indication that this was Congress's intent.

Moreover, as the DEP points out, under Pennsylvania law the term "construction" is defined differently in various context relative to the development of a landfill. For example, under the Pennsylvania Air Pollution Control Act, one cannot "*construct* ... any stationary air contamination source ... unless such a person has applied to and received written plan approval" from the DEP. *See* 35 P.S. § 4006.1(a). Leatherwood did not submit its application for an air quality plan approval until 1999. (*See* Ex. 2 of Leatherwood's Append. to Statement of Material Facts, ¶ 1701.) Pursuant to Pennsylvania's air regulations, 25 Pa.Code § 121.1, construction means "[t]o physically initiate assemblage, installation, erection or fabrication of an air contamination source of an air pollution control device, including building supports and foundations and other support functions." Under federal air regulations relating to standards of performance for new stationary sources, 40 C.F.R. Part 60, adopted by the DEP at 25 Pa.Code § 122.3, the term "construction" is defined as "fabrication, erection or installation of an affected facility." Thus, it is somewhat misleading to suggest that the term "construction" as it relates to landfills is definitively explained by reference to the DEP's Solid Waste Permit.

definitions unique to Pennsylvania regulatory law.

██ Leatherwood also contends that the Advisory Circular is not reflective of true Congressional intent, but represents merely the Agency's capitulation to political pressure. It alleges that those Agency personnel involved in the drafting process were aware of Representative Shuster's political opposition to the Happy Landing and Jefferson Landfills, that the drafters viewed § 503(d) as Shuster's successor to § 1220 of FARA, and that they knew Shuster controlled the FAA's budget. Leatherwood is also critical of the fact that, during the drafting process, Agency personnel consulted with the Majority Legal Counsel to the House Transportation Committee concerning the meaning of § 503(d). Unlike Leatherwood we do not believe these facts, even if true, bespeak any impropriety on the part of the Advisory Circular drafters. To the contrary, we think the drafters consulted appropriate legislative sources to the extent they considered the historical context of § 503(d)'s enactment, the May 30, 2000 letter from the House Committee on Transportation and Infrastructure, and the comments of majority legal counsel to the authoring Congressional Committee.

██ Leatherwood further claims that the Advisory Circular is entitled to no deference because the FAA has allegedly been inconsistent in applying its interpretation of § 503(d). First, Leatherwood points out that two different FAA employees construed the Advisory Circular differently with regard to the Jefferson Landfill. Linda Bruce, an employee charged with rendering determinations as to the applicability of § 503(d), had formed the opinion as of September 11, 2000 that the Happy Landing and Jefferson Landfills were not subject to § 503(d)'s prohibition. Ms. Bruce later went on maternity leave, however, and her responsibilities were assigned to Edward Cleary, who arrived at a contrary conclusion. Mr. Cleary ultimately drafted the January 29, 2001 letter, signed by Woodie Woodward, that formally advised the DEP as to the FAA's position that § 503(d)(1) applied to the Jefferson Landfill. (*See* Ex. 14 to Appendix to Leatherwood's Resp. to the [FAA]'s Mot. for Summ. Judg.) However, the fact that the record reflects some difference of opinion between FAA staff members as to the Advisory Circular's application does not convince us that the Circular has been applied inconsistently by the FAA. One might naturally expect some disagreement among agency personnel as the application of an agency's interpretive guidelines is refined by the agency. And, insofar as the Jefferson Landfill is concern, we see no evidence that the FAA has ever wavered from the position taken in its January 29, 2001 letter, which constitutes the Agency's official pronouncement concerning the applicability of § 503(d). Whatever Ms. Bruce's opinions may have been as of September 2000, it does not appear that she functioned as the official spokesperson for the Agency concerning the scope of affected landfills. In sum, we see no evidence in this record to suggest that the FAA officially applied its Advisory Circular in an inconsistent manner vis a vis the Jefferson Landfill.

Leatherwood also contends that the FAA applied the Advisory Circular inconsistently with respect to the North Hartland Landfill in Vermont. Having reviewed the record on this point, the Court does not agree. The FAA's final determination that the North Hartland Landfill falls within the exception in § 503(d)(2) was based (as Leatherwood notes) on the FAA's determination that the landfill had "commenced construction" relative to the landfill—specifically, an existing building

was renovated and now serves as the offices for the municipal waste district that owns the nearby landfill site. Leatherwood apparently feels that its landfill should likewise be found to fit the exception under § 503(d)(2) based on its having conducted similar "construction-type" of activity relative to the Jefferson Landfill. However, unlike the Jefferson Landfill, the North Hartland Landfill was "permitted by the appropriate regulatory or permitting authority" as of AIR–21's enactment. (*See* Exs. 11 and 17 of Append. to Leatherwood's Resp. to the [FAA]'s Mot. for Summ. Judg.) Thus, even assuming *arguendo* that the North Hartland and Jefferson Landfills were identical in terms of their construction-related activities, this material distinction in the status of their permits as of April 5, 2000 renders the FAA's disparate treatment entirely logical and consistent with the terms of the Advisory Circular.

Eagle also attacks the Advisory Circular's definition of "establishment" under the theory that it renders the concept "commence the establishment" superfluous. Eagle reasons that, if "establishment" means "receive the first load of putrescible waste," then one can commence that process only by receiving the first load of waste. Otherwise stated, "establishment" becomes synonymous with the "commencement of establishment," and the latter concept becomes meaningless surplusage. While this may be a fair observation, we do not think the criticism renders the Advisory Circular's definitions untenable. Perhaps the term "establish a municipal solid waste landfill" should have been defined in the Advisory Circular as "receive putrescible waste" rather than

"receive the first load" of waste. Had it been so defined, the concept of "commencing the establishment" of the landfill might have made more sense. But under either interpretation we get to the same result: a landfill is considered "established" as of April 5, 2000—and therefore outside the reach of § 503(d)(1)—if it was receiving putrescible waste on or before that date. We are mindful that courts should endeavor, whenever possible, to give meaning to every word Congress uses. *See Rosenberg*, 274 F.3d at 141. Nevertheless, we conclude that the Advisory Circular provides a workable interpretation of § 503(d) that we think is most in line with Congress's true intent. Accordingly, Eagle's criticism does not give the Court pause in adopting the Advisory Circular's definitions.

Eagle further posits that, even if this Court adopts the Advisory Circular's definition of "construction," we must find that the Happy Landing Landfill satisfies that definition. Eagle points out that, after receiving its permits from the DEP in February of 1996, it installed twelve ground water monitoring wells in accordance with the DEP's Solid Waste Permit, commenced excavation work, set up a temporary office structure, and installed erosion/sedimentation silt fencing. Eagle contends that these activities, all of which were undertaken prior to April 5, 2000, constitute the "commencement of construction." [17] Once again, the Court is not persuaded. We think that implicit in the Advisory Circular's definition of "construct[ion] of a municipal solid waste landfill" is a temporality requirement: i.e., the landfill must have been under construction

17. We note that the FAA has apparently been consistent in opining that the installation of groundwater monitoring wells does not constitute the "construction" of a landfill for purposes of § 503(d)(2). The FAA has taken this position, it seems, both with respect to the Jefferson and the North Hartland Landfills. (*See* Ex. 13, p. 00745, and Ex. 14 of Appendix to Leatherwood's Resp. to the [FAA]'s Mot. for Summ. Judg.)

*and* "permitted by the appropriate regulatory or permitting authority" *as of April 5, 2000.* This requirement Eagle did not meet, as its Solid Waste Permit was still under suspension in April of 2000. Eagle's interpretation, taken to a logical extreme, could lead to an absurd result whereby a landfill—once permitted remotely in time—would reap the benefit of § 503(d)(2)'s exception indefinitely. We do not think Congress envisioned such a result.

In sum, for all of the reasons stated, we find that the Advisory Circular is a persuasive interpretation of Congress's intent in enacting § 503(d) of AIR–21. Because we adhere to that interpretation, we conclude that neither the Happy Landing Landfill nor the Jefferson Landfill had commenced their construction or establishment as of April 5, 2000. In so concluding, we need not and do not reach any conclusion as to whether it would be appropriate for the FAA to exempt either landfill on the basis that "such exemption would have no adverse impact on aviation safety." *See* 49 U.S.C. § 44718(d)(1).

## VII. CONSTITUTIONAL CHALLENGES

Finally, we turn to the FAA's motion seeking summary judgment as to Counts III through VI of Eagle's Amended Complaint. In these counts, Eagle raises various constitutional challenges to Section 503(d): Count III alleges that the statute constitutes an unlawful delegation of authority to state aviation agencies; Count IV avers that the statute unlawfully compels state aviation agencies to participate in the administration of a federal regulatory program; Count V claims that the statute impairs Eagle's right to petition for government for redress; Count VI asserts that Section 503(d) violates Eagle's equal protection and due process rights.

Notably, Eagle has never filed any brief in response to the FAA's motion for summary judgment on these particular claims. Counsel for Eagle reiterated at oral argument that he was focusing his efforts on the statutory construction challenge presented in Count I of the Amended Complaint. We therefore assume that Eagle is abandoning Counts III through VI. Nevertheless, we will consider the FAA's motion on its merits despite the lack of any meaningful response by Eagle.

*Unconstitutional Delegation of Legislative Power*

AIR–21 provides that landfills otherwise covered by the statute's general prohibition may be exempted if "the State aviation agency of the State in which the airport is located requests that the Administrator of the [FAA] exempt the landfill from the application of [Section 503(d)(1)] and the Administrator determines that such exemption would have no adverse impact on aviation safety." 49 U.S.C. § 44718(d)(1). Eagle's complaint under Count III is that AIR–21 delegates the authority to exempt particular landfills to state aviation agencies without an intelligent principle guiding the exercise of their discretion.

Significantly, the Court of Appeals for the Third Circuit has already expressed its doubts as to the viability of this particular challenge. *See Khodara,* 237 F.3d at 192 ("The amended statute also alleviates the non-delegation and separation-of-powers concerns raised by the old law."). We likewise view the claim as untenable because it is evident that § 503(d)(1) provides no delegation of exemption authority to the states. As the Third Circuit accurately observed, "[t]he amended statute, in contrast [to Section 1220 of FARA] grants no statutory power to local authorities. Rather, the final power to make exceptions is granted to the Administrator of the

FAA, who is an agent of the federal executive." 237 F.3d at 192. Moreover, the state agency's exercise of discretion under § 503(d)(1) in seeking exemption is not unprincipled; it is clear that the touchstone for any exemption request must be tied the landfill's compatibility with air traffic safety, especially concerns about the potential for bird strikes. We will therefore grant summary judgment in favor of the FAA as to Count III of Eagle's Amended Complaint.

*Unconstitutional Commandeering of State Aviation Agencies*

■■■■■ Count IV of the Amended Complaint avers that AIR–21 unlawfully compels state aviation authorities to participate in the administration of a federal regulatory program. The Tenth Amendment to the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." U.S. CONST. AMEND. X. In accordance with this principle, the "Federal Government may not compel the States to enact or administer a federal regulatory program." *Printz v. United States,* 521 U.S. 898, 933, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). In *Printz,* the Supreme Court further explained that Congress cannot circumvent this prohibition by directly "conscripting" state officers to participate in a federal regulatory program. Accordingly, "[t]he Federal Government may neither issue directives *requiring* the States to address particular problems, nor *command* the States' officers ... to administer or enforce a federal regulatory program." 521 U.S. at 935, 117 S.Ct. 2365 (emphasis supplied).

As the FAA correctly notes, AIR–21 does not compel state aviation agencies to enact regulations or implement a federal program. In fact, state agencies are not compelled to take any action whatsoever under Section 503(d)(1). Rather, the statute merely allows the relevant state agency to seek an exemption from Section 503(d)(1) on behalf of an otherwise prohibited landfill, *if it chooses to do so in its discretion.* The ultimate decision as to the propriety of an exemption requests lies with the FAA Administrator. Accordingly, there is no basis for a finding that § 503(d) offends Tenth Amendment principles, and summary judgment in favor of the FAA is appropriate as to Count IV.

*Unconstitutional Impairment of First Amendment Rights to Petition the Government for Redress of Grievances*

■■■■ Count V of Eagle's Amended Complaint asserts that AIR–21 impairs Eagle's right to petition the government for redress of grievances. Because Eagle has not filed any responsive brief to the FAA's motion, we do not have the benefit of knowing specifically how Eagle feels aggrieved and/or limited in its right to petition for redress. We assume that Eagle's claim implicates the exemption process under § 503(d)(1) and that Eagle would contend that there is no avenue by which it can challenge an adverse exemption decision by the FAA. To the extent this is Eagle's argument, it lacks merit. We presume that an adverse decision by the FAA under § 503(d)(1) would be reviewable, at the proper time, under the procedures of the Administrative Procedures Act, 5 U.S.C. §§ 551 *et seq.,* at which time the reviewing court would have the benefit of an administrative record. We agree with the FAA that the exemption process at issue is consistent with the purpose of Section 503(d), which is rooted in aviation safety, not the regulation of speech, assembly, court access, or other First Amendment rights. Eagle has made no showing that the exemption process significantly impedes its ability to seek

redress and, therefore the Court will grant the FAA's motion for summary judgment as to this claim.

*Violation of Equal Protection and Due Process Rights*

 Finally, Eagle makes the assertion in Count VI of its Amended Complaint that AIR–21 violates its rights to equal protection and due process under the law. We agree with the FAA that, for purposes of Eagle's equal protection claim, the relevant test is the "rational basis test" generally applicable to economic regulations that do not create suspect classifications or otherwise burden fundamental rights. *See Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981). Under this test, we must uphold the legislative classification if it bears a rational relation to some legitimate governmental interest. *See Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Indeed, Congress need not 'actually articulate … the purpose or rationale supporting its classification,' *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citation omitted), and we must uphold the law if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). In applying this standard, we are mindful that legislation generally carries with it "a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel,* 452 U.S. at 331–32, 101 S.Ct. 2376.

 Applying the foregoing standards, we conclude that Eagle does not have a viable equal protection claim under Count VI. We observed in *Khodara I,* and continue to find, that Congress has a legitimate interest in promoting aviation safety. *See*

91 F.Supp.2d at 850. Consistent with that end, Congress prospectively limited the construction and establishment of new landfills within a generic 6–mile buffer zone around airports that regularly schedule smaller-aircraft flights. We readily conclude that this general prohibition is rationally designed to prevent bird strikes involving smaller aircraft and therefore serves the legitimate interest of enhanced aviation safety. As this Court stated in *Khodara I:*

> [T]he Court does not take issue with the general concept of creating a six-mile buffer zone around airports, from which all proposed landfills are excluded. While the Plaintiff suggests that a "six-mile" zone is arbitrary and unrelated to past FAA regulatory guidelines, we do not believe that a general six-mile prohibition, in and of itself, would violate equal protection principles. Under such a general guideline, we can well envision that Congress might rationally have believed that prohibiting the establishment of any landfills within six-miles of an airport would advance the cause of air safety. Although such a prohibition might arguably be overly-conservative, it would not offense equal protection principles.

91 F.Supp.2d at 852.

Nor do we think that the "grandfather clause" limiting the application Section 503(d) to new landfills creates an irrational class. Congress could legitimately decide to phase in the regulation in order to ameliorate the hardship which might otherwise result from the closure of landfills already operational or underway with active construction. As we observed in relation to Section 1220 of FARA:

> [W]e can conceive of a rational purpose (albeit one unrelated to air safety) for regulating only proposed landfills and excluding already active ones from the

statute's scope. Congress, for example, might have intended to limit the effect of the Act by protecting those who already had an expectant property interest in their already active landfill operations. The statute is rationally related to achieve that end.

91 F.Supp.2d. at 852. The Third Circuit's comments on the amendment are further instructive:

The 2000 Amendment significant broadened the scope of the statute, thus resolving many of the District Court's equal protection concerns. Unlike the challenged law, the new statutory scheme does not work to single out the Happy Landing site for exceptional treatment. In essence, the amended statute creates a purely prospective six-mile "safety zone" around all federally-funded (non-Alaskan) airports with regularly scheduled flights of 60 passengers or less.

*Khodara*, 237 F.3d at 192. In sum, the classification drawn by Congress in Section 503(d) is not irrational vis a vis the government's legitimate interest in preventing bird-aircraft collisions. It will therefore not be disturbed.

▮▮▮▮▮ Turning finally to Eagle's due process claim, we note only that Eagle asserts it has been deprived of its property by virtue of § 503(d)(1) without due process of law. (Amended Complaint at Count VI, ¶ 36.) Unfortunately, in the absence of more information we are hard pressed to intelligently evaluate the viability of this claim. It is unclear, for example, whether Eagle is raising a substantive "takings claim" and, if so, whether it is a facial challenge to the statute or an "as-applied" challenge. We discussed this distinction in *Khodara I*:

Facial takings claims assert that the mere enactment of a statute effects a taking of property without just compen-

sation, irrespective of its particular applications. *See Garneau v. City of Seattle*, 147 F.3d 802, 811 (9th Cir.1998) ("[I]n a facial claim, the court does not analyze the exaction at all. Rather, the court looks to whether the enactment of the ordinance, under which exactions will be imposed, effects a taking"); *Carson Harbor Village, Ltd. v. City of Carson*, 37 F.3d 468, 473–74 (9th Cir.1994) ("A facial challenge involves a claim that the mere enactment of a statute constitutes a taking, while an as-applied challenge involves a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation."), *overruled in non-relevant part, WMX Tech., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997).

91 F.Supp.2d at 840 n. 13. A plaintiff can establish a facial "takings" violation by demonstrating either that (a) the regulation does not substantially advance legitimate state interests, or that (b) it denies the plaintiff the economically viable use of its land. *Id.* (citing *Sinclair Oil Corp. v. County of Santa Barbara*, 96 F.3d 401, 405 (9th Cir.1996), *cert. denied*, 523 U.S. 1059, 118 S.Ct. 1386, 140 L.Ed.2d 646 (1998)).

For present purposes, we will assume that Eagle is raising a facial challenge to § 503(d)(1) as a substantive taking of its property. To the extent that Eagle would contend the statute does not substantially advance a legitimate state interest, we reject this claim for the reasons previously discussed in relation to Eagle's equal protection claim. To the extent that Eagle would assert § 503(d)(1) deprives it of the economically viable use of its land, we determine that such claim is not ripe for disposition in that there is no evidence suggesting that Eagle has sought, and been denied, just compensation from the government. *See Williamson Cty. Reg. Planning Comm'n v. Hamilton Bank*, 473

U.S. 172, 194 n. 13, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) ("[B]ecause the Fifth Amendment proscribes takings without just compensation, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 suit."); *Sinclair Oil Corp.*, 96 F.3d at 406 (the just compensation ripeness requirement applies to claims premised upon the denial of a property's economically viable use). Furthermore, there is no evidence that Eagle has as yet sought, and been denied, the statutory exemption provided for in § 503(d)(1). Alternatively, we would conclude that the claim must fail because there has been no record development as to whether Eagle's property retains any economic viability in the absence of its landfill. Under either analysis, Count VI of the Amended Complaint cannot survive this procedural juncture.

## VIII. CONCLUSION

For all of the reasons previously discussed, the Plaintiffs' motions for summary judgment will be denied. The Intervenors' motion for summary judgment is denied. The motions for summary judgment filed by the Commonwealth and Federal Defendants will be granted. Count II of Eagle's Amended Complaint will be dismissed for lack of jurisdiction. As to all other claims presented in these consolidated actions, judgment will be entered against Plaintiffs and in favor of the Defendants.

## *ORDER*

AND NOW, this 30th day of September, 2002, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED as follows:

1. Kelly Burch is hereby substituted as Defendant in lieu of Steven Beckman pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

2. The Motion [Doc. No. 176] for Summary Judgment Filed by the Intervenors Jefferson County and Pine Creek Township Against Eagle Environmental, L.P. is DENIED with prejudice;

3. Leatherwood Inc.'s Motion [Doc. No. 193] for Summary Judgment is DENIED with prejudice;

4. The Commonwealth Defendants' Motion [Doc. No. 196] for Summary Judgment Against Plaintiff Leatherwood, Inc. is GRANTED;

5. The Federal Defendants' Motion [Doc. No. 200] for Summary Judgment as against Plaintiff Leatherwood, Inc. is GRANTED;

6. The Federal Defendants' Motion [Doc. No. 202] for Summary Judgment as against Plaintiff Khodara Environmental, Inc. is GRANTED;

7. Plaintiff, Khodara Environmental, Inc.'s Motion [Doc. No. 223] for Summary Judgment is DENIED with prejudice.

IT IS FURTHER ORDERED that Count II of Plaintiff Khodara Environmental, Inc.'s Amended Complaint is DISMISSED without prejudice for lack of jurisdiction. As to all other causes of action involved in these consolidated actions, JUDGMENT is hereby entered in favor of all DEFENDANTS and against Plaintiffs Khodara Environmental, Inc. and Leatherwood, Inc.

The Clerk is hereby directed to designate this file as CLOSED.